# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 08-81256-CIV-RYSKAMP/VITUNAC

EDWIN FRANZE,

     Plaintiff,

v.

THE PALM BEACH POST,

     Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE comes before the Court pursuant to Defendant The Palm Beach Post's ("Defendant") Motion for Summary Judgment, filed August 28, 2009 **[DE 27]**. Plaintiff Edwin K. Franze ("Plaintiff") responded on October 22, 2009 **[DE 40]**. Defendant replied on November 2, 2009 **[DE 41]**. This motion is ripe for adjudication.

## I.    BACKGROUND

Plaintiff, an African-American male, began working as Director of Distribution for Defendant in March 2003. The Vice President of Circulation, Barry Berg ("Berg"), a white male who had previously worked with the Plaintiff at *The Philadelphia Inquirer* from 2001 through 2002, recruited and hired the Plaintiff. Berg pursued hiring Plaintiff because he had considerable experience in the newspaper industry and because Berg wanted to increase workplace diversity by placing an African-American in an upper level management position. During Plaintiff's job interview, Berg emphasized that the Plaintiff was being hired to lead and develop the employees in the Circulation Department.

As Director of Distribution, Plaintiff oversaw distribution functions in the Home Delivery, Transportation, and Customer Service sections of the Circulation Department. Plaintiff supervised three Home Delivery Area Managers, one Transportation Manager, one Customer Service Manager, and one administrative assistant. He reported directly to Berg.

Shortly after Plaintiff was hired, he suggested that Berg hire Michael Barnum ("Barnum"), an African-American male, to assist Plaintiff with his duties and bring diverse experiences to the Circulation Department. Barnum, a friend of Plaintiff, had previously worked with Berg and Plaintiff at *The Philadelphia Inquirer*. In July 2003, Berg hired Barnum as a Home Delivery Area Manager whose job was to oversee operations and employees at six distribution centers. Berg expected that Barnum would share his knowledge and experience with his peers and develop his employees' performance. During Barnum's job interview, Berg emphasized that Barnum was being hired to train and improve the staff, document employee performance and disciplinary issues, and share his experiences with his peers. Barnum's own testimony confirms that he was hired for that purpose:

> Barry and I worked together two years in Philadelphia. And we had accomplished a lot of positive things in Philadelphia in regard to improving key indicators. We had eliminated some of the personnel. We had made our department much more efficient, and we became much more productive. When Barry left Philadelphia, Barry was looking to do the same thing, as he explained to me, the same thing down at *The Palm Beach Post*. And one of the charges that he gave me was, I was going to come in, evaluate the talent, if there were some people that we would coach along to get *The Palm Beach Post* to the next level, if you will, fine. If not, there were some people that we were going to have to manage out. . . . [Berg] asked me to come down and evaluate the talent pool of the District Managers.

(Barnum Dep. 18-19, 25).

Because of Barnum's previous experience and the high expectations for his performance,

Berg convinced his supervisor to agree to pay Barnum $15,000.00 more per year than the two other Home Delivery Area Managers earned, both of whom were white and had worked for the company for twenty years.

Berg was immediately dissatisfied with Barnum's work performance. Although Barnum's service levels were satisfactory, he failed to achieve the primary goal for which he had been hired – staff development. For example, Berg observed that Barnum did not develop personnel plans for his staff, did not address employee complaints, did not assist his district managers with documentation and performance evaluations, and did not spend sufficient time visiting his distribution centers. Berg had heard from Barnum's peers and subordinates that Barnum had not earned the trust of his employees and was not accessible to his staff members. Additionally, Berg disagreed with Barnum's decision to take a vacation shortly after he was hired, and when he called Barnum's office on one occasion, Barnum's secretary informed him that Barnum was not answering telephone calls because he was practicing putting on a miniature golf course.

On September 30, 2003, Plaintiff rated Barnum as "excellent" on his first performance evaluation. Berg signed the evaluation without reviewing it. Upon later review, Berg was concerned by Plaintiff's failure to document any of the deficiencies that Berg had observed in Barnum's performance. Plaintiff explained that he had given Barnum a positive evaluation because he believed that Barnum's performance on objective, measurable criteria either equaled or exceeded the performance of the two other Home Delivery Area Managers. Although Plaintiff claims the other Home Delivery Area Managers had performance deficiencies, he never documented them, which was part of his job.

Throughout the following months, Berg and Plaintiff met with Barnum on several occasions to discuss ways for Barnum to improve his work performance. Berg also took Barnum to lunch to discuss his performance. After this series of meetings, Berg directed Plaintiff to create a performance improvement plan for Barnum, which included goals such as helping his weakest subordinates increase their productivity, strengthening relationships with other supervisors, improving documentation of employee issues, and creating training opportunities for his subordinates. Berg also enrolled Barnum in a three-part training program that is mandatory for all managers at the company.

Plaintiff did not agree with Berg that Barnum's performance was unsatisfactory, and this disagreement began to strain their working relationship. Nevertheless, Plaintiff testified that Barnum could have handled certain situations better and that he had counseled Barnum on non-objective factors, such as field time and documentation.

Around the same time, Berg also observed problems with Plaintiff's work performance. Although Plaintiff's performance along objective criteria, known in the industry as "key indicators," was mostly satisfactory, Plaintiff was not achieving the primary goals for which he had been hired – strong leadership and staff development. For example, despite repeated directives, the Plaintiff was not managing Barnum's performance. Additionally, several of Plaintiff's subordinates bypassed Plaintiff and complained directly to Berg or the Vice President of Human Resources about their concerns. Other employees informed Berg that the Plaintiff humiliated employees before their peers at the monthly management meetings. Berg felt that he spent most of his working hours managing Plaintiff's employees, which was Plaintiff's job.

Berg wanted to help Plaintiff improve his performance, so he met with Plaintiff on

several occasions to discuss his management style, leadership, and his employees' perceptions of his attitude. Berg directed Plaintiff to improve communications with his staff, improve documentation of employee issues, follow up with his employees as part of the documentation process, and meet with the independent contractors on a monthly basis to communicate with them and discuss their concerns. Berg also directed Plaintiff to help improve Barnum's performance and leadership to justify his higher salary.

Despite repeated coaching, Berg observed that Barnum failed to satisfy most of the goals and tasks outlined in his performance improvement plan. For example, Berg observed that Barnum never met with a colleague to discuss the budgeting process, never assisted another colleague on a newspaper project, and failed to attend two out of three classes of the mandatory management training program. Because Barnum failed to improve his performance after several months, Berg terminated Barnum's employment on March 1, 2004. Berg personally terminated Barnum because Plaintiff indicated to Berg that he did not feel comfortable doing the termination because of his personal friendship and previous work history with Barnum.

Plaintiff claims he complained to Berg that his treatment of Barnum was racially discriminatory. Specifically, he claims that between December 18, 2003 and March 2004, he had "[p]robably more than one" conversation with Berg in which he told Berg that his treatment of Barnum was "unfair and wrong" because Barnum's performance on measurable criteria was equal to or better than the performance of his peers. Significantly, Plaintiff does not remember whether he told Berg that his treatment of Barnum was racially discriminatory, as opposed to merely unfair. Berg testified that Plaintiff disagreed with his decision to terminate Barnum's employment, but he never complained to Berg that Berg had discriminated against Barnum based

on his race.  Plaintiff did not report the alleged discrimination to the Human Resources

Department or to anyone other than Berg.  After Barnum's termination, Plaintiff did not make

any further complaints to Berg about his treatment of Barnum.

After Barnum's termination, Berg felt that Plaintiff became "disengaged."  On March 23,

2004, Berg issued the Plaintiff a memorandum discussing his concerns about Plaintiff's

performance deficiencies.  The memorandum stated that Berg was especially disappointed with

the way Plaintiff had failed to recognize or manage Barnum's performance problems.  The

memorandum also stated that Berg had heard from three sources that Plaintiff had applied for a

position at another newspaper.  Berg directed Plaintiff to improve his documentation, create a

training and development plan for his staff, and adopt a more "hands on" approach to

employee relations.

Plaintiff responded to Berg's criticisms in a memorandum dated March 26, 2004.  In the

memorandum, Plaintiff indicated his disagreement with Berg's opinion of Barnum's

performance, but stated that, "While I differ with your perceptions of Mike's performance, I do

respect your level of authority in the company to terminate him."  Plaintiff did not indicate in the

memorandum that Berg had discriminated against Barnum or that Plaintiff had complained about

discrimination to Berg.

In September 2004, a major hurricane hit south Florida.  Plaintiff's responsibility during

the hurricane was to ensure the distribution of newspapers by overseeing distribution center

operations from the company's main office.  Plaintiff left the main office around 1:30 p.m. and

did not return to work.  Plaintiff also failed to attend three hurricane preparation meetings.  His

subordinates attempted to contact him, but he could not be reached.  In Plaintiff's absence, Berg

was required to assume control of Plaintiff's responsibilities and gather information for the publisher. Berg did not see Plaintiff again until 6:00 a.m. the following day at one of the distribution centers. Plaintiff claims that during his absence he was visiting the distribution centers to evaluate damage caused by the hurricane. Berg had not directed Plaintiff to visit the distribution centers because the Home Delivery Area Managers generally handled that task.

Berg was concerned that Plaintiff had not attended the hurricane preparation meetings, had not stayed at the company's main office to communicate with his subordinates regarding the distribution process, and was unavailable during the hurricane. Berg decided to eliminate Plaintiff's position because he was personally performing the majority of the Plaintiff's duties, the Plaintiff's subordinates were all reporting to him, and the Plaintiff had never demonstrated the leadership ability for which he was hired. Berg eliminated Plaintiff's position and terminated Plaintiff's employment on September 15, 2004. Regarding his termination of both Barnum and the Plaintiff, Berg testified that, "I hired the two of them and . . . it was a painful situation for me to go through, not to have them be successful as well."

On June 11, 2008, Plaintiff and Barnum filed a complaint against Defendant in state court alleging race discrimination and retaliation in violation of 42 U.S.C. § 1981. The complaint alleges that Defendant discriminated against Plaintiff and Barnum based on their race and retaliated against Plaintiff by terminating his employment after he complained about the discrimination. Defendant removed the case to this Court and filed an answer. On April 27, 2009, the Court entered an order at the parties' request that dismissed Barnum from the case. Accordingly, only Plaintiff's claims for race discrimination and retaliation remain.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 5(c).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986) (quoting Fed. R. Civ. P. 56(c)).  An issue is "material" if it is a legal element of the claim under applicable substantive law that may affect the resolution of the action.  See Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106  2505, 2510 (1986).  An issue is "genuine" if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party.  See id.  The movant may meet this standard by presenting evidence demonstrating the absence of a dispute of material fact or by showing that the nonmoving party has not presented evidence in support of an element of its case on which it bears the burden of proof.  Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53.  The moving party need not supply "affidavits or other similar materials negating the opponent's claim."  Id.

Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S.Ct. at 25 going to 53 (quoting Fed.R.Civ.P. 56(e)).  Although the nonmovant need

not present evidence that would be admissible at trial, it may not rest on his pleadings. <u>Id.</u> "[T]he plain language of rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Id.</u> at 322; 106 S.Ct. at 2552. <u>See</u> <u>also</u> <u>Graham v. State Farm Mut. Ins. Co.</u>, 193 F.3d 1274, 1281-82 (11th Cir. 1999).

### III.     <u>DISCUSSION</u>

**A.     Race Discrimination Claim**

**1.     Legal Standard**

42 U.S.C. § 1981 ("Section 1981") "prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." <u>Ferrill v. Parker Group, Inc.</u>, 168 F.3d 468, 472 (11th Cir. 1999). To analyze race discrimination claims brought under Section 1981, courts apply the same framework used to analyze disparate treatment claims brought under Title VII of the Civil Rights Act of 1964. <u>Rice-Lamar v. City of Fort Lauderdale</u>, 232 F.3d 836, 843 n.11 (11th Cir. 2000). Under this framework, a plaintiff may prove race discrimination through direct evidence of discriminatory intent, statistical evidence demonstrating a pattern of discrimination, or circumstantial evidence creating an inference of discrimination. <u>Standard v. A.B.E.L. Servs., Inc.</u>, 161 F.3d 1318, 1330 (11th Cir. 1998).

Direct evidence "establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." <u>Id.</u> Direct evidence includes an

employer's actions and statements that reflect a discriminatory attitude correlating to the alleged discrimination. Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir. 1997). Evidence that merely suggests discrimination or is subject to more than one interpretation is not direct evidence. Id. "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of" race, are direct evidence of discrimination. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004). "[T]he quintessential example of direct evidence would be 'a management memorandum saying, 'Fire Earley-he is too old.''" Merritt, 120 F.3d at 1190 (quoting Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990)).

Absent direct evidence, an employee may show circumstantial evidence of race discrimination using the burden shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089 (1973). Wilson, 376 F.3d at 1087. That framework requires the employee to establish a *prima facie* case of race discrimination. Id. To do so, the employee must show by a preponderance of the evidence that he belongs to a protected class, that he was qualified for his position, that he was subjected to an adverse employment action and that his employer treated similarly situated employees outside his protected class more favorably. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824; Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).

A plaintiff must present evidence of a similarly situated comparator to prove that his employer treated similarly situated employees outside his protected class more favorably. Holifield, 115 F.3d at 1562 (citing Coutu v. Martin Cty. Bd. of Cty. Comm'rs, 47 F.3d 1068,

1073 (11th Cir. 1995). The plaintiff and the comparator must have very similar job

characteristics, be "similarly situated in all relevant respects," and be involved in or accused of

the same or similar conduct, but disciplined in different ways. Holifield, 115 F.3d at 1562.

"[A]bsent some other similarly situated but differently disciplined worker, there can be no

disparate treatment." Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000). If the plaintiff

fails to show the existence of a comparator, summary judgment is appropriate in the absence of

other evidence of discrimination. Holifield, 115 F.3d at 1562.

If the employee establishes a *prima facie* case, the burden shifts to the employer to

counter this inference by presenting legitimate, non-discriminatory reasons for its adverse

employment action. Holifield, 115 F.3d at 1564. The employer's burden is "exceedingly light."

Id. (quoting Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994)). The

employer need not persuade the court that it was actually motivated by the proffered reasons; it is

sufficient if the employer's evidence raises a genuine issue of fact as to whether it discriminated

against the employee. Texas Dep't of Cmty. Affairs, 450 U.S. at 254-55, 101 S.Ct. at 1094.

If the employer satisfies this burden, the burden shifts back to the employee to

demonstrate that the employer's articulated reason for the adverse employment action is a pretext

for discrimination. Holifield, 115 F.3d at 1565. "The inquiry into pretext centers upon the

employer's beliefs, and not the employee's own perceptions of his performance." Id. at 1565.

An employer "may fire an employee for a good reason, a bad reason, a reason based on erroneous

facts, or for no reason at all, as long as its action is not for a discriminatory reason." Abel, 210

F.3d at 1339 n.5 (quoting Nix v. WLCY Radio/Rahall Comm., 738 F.2d 1181, 1187 (11th Cir.

1984)). To prevail, the employee must discredit the employer's proffered explanation by

demonstrating that a discriminatory reason "more likely than not" motivated the employer's decision. Watkins v. Sverdrup Tech., Inc., 153 F.3d 1308, 1314 (11th Cir. 1998) (quoting Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993)).

### 2. No Direct Evidence

Plaintiff presents no direct evidence of race discrimination. He has not alleged that Berg told him that his termination was based on his race. He has not alleged that Berg or any other employee ever made any comments or jokes regarding his race. Nor has Plaintiff presented any statistics demonstrating a pattern of race discrimination. Accordingly, Plaintiff has not met the stringent standard for proving race discrimination through direct or statistical evidence.

### 3. No Circumstantial Evidence

For purposes of this motion, Defendant does not dispute that Plaintiff is a member of a protected class, that he was qualified for his position and that he was terminated from his employment. Nevertheless, Plaintiff has not established a *prima facie* case of race discrimination because he has not presented any evidence that Defendant treated any similarly situated employee outside his protected class more favorably. For example, he has not alleged that Defendant failed to terminate any non-black employee in upper management for equally poor or worse job performance. Without proof of a comparator, and without other evidence of discrimination, Plaintiff cannot establish a *prima facie* case of race discrimination based on circumstantial evidence.

### 4. Legitimate, Non-Discriminatory Reasons for Termination

Even if Plaintiff could establish a *prima facie* case of race discrimination, Defendant has

proffered legitimate, non-discriminatory reasons for terminating Plaintiff's employment. Specifically, Berg terminated Plaintiff for continuous unsatisfactory work performance that began several months before Barnum's termination. Plaintiff never accomplished the specific goals for which he was hired – he failed to demonstrate strong leadership, and he failed to train and develop his staff. Berg documented Plaintiff's performance deficiencies in several memoranda, notified Plaintiff of his performance deficiencies on numerous occasions and provided Plaintiff with several opportunities to improve. Despite Berg's counseling, support and advice, Plaintiff's performance never lived up to Berg's expectations. After Plaintiff failed to perform his duties during the hurricane, Berg determined that he no longer needed Plaintiff's position because he was already performing the majority of Plaintiff's duties and because Plaintiff's subordinates had started reporting to him.

    **5.**     **No Demonstration of Pretext**

Plaintiff has not presented any evidence that Defendant's reason for his termination is pretextual. In fact, the record is devoid of any evidence that Berg's decision was "more likely than not" motivated by Plaintiff's race or that Berg harbored any discriminatory animus towards Plaintiff. Plaintiff cannot show pretext merely by second-guessing Defendant's business judgment. Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997). Where an employer has produced documentary evidence regarding an employee's unsatisfactory performance, the employee's assertions of his own good performance are insufficient to defeat summary judgment in the absence of other evidence of discrimination. Holifield, 115 F.3d at 1565. Defendant has produced sufficient evidence of Plaintiff's unsatisfactory work performance, and Plaintiff's own opinion of his performance is insufficient to demonstrate

pretext.

### 6.     Same Decision-Maker Inference

The Eleventh Circuit recognizes a permissible inference of non-discrimination when the same decision-maker both hires and terminates the employee.  See <u>Williams v. Vitro Servs. Corp.</u>, 144 F.3d 1438, 1443 (11th Cir. 1998).  That Berg both hired and terminated Plaintiff within a year and a half creates a permissible inference that Berg's reason for terminating Plaintiff was based on Plaintiff's unsatisfactory work performance rather than Plaintiff's race.  Additionally, that Berg hired and terminated Barnum within nine months creates a permissible inference that Berg's termination was not based on his race.

## B.     Retaliation Claim

### 1.     Legal Standard

The Supreme Court recently held that employment-related retaliation claims are cognizable under Section 1981, including retaliation claims brought by employees who have complained about the violation of other employees' contract-related rights.  <u>CBOCS West, Inc. v. Humphries</u>, 128 S.Ct. 1951, 1954 (2008).  Although courts are now recognizing Section 1981 retaliation claims, the elements of this cause of action are not settled in the Eleventh Circuit.  <u>Moatamedi v. Beckman Coulter, Inc.</u>, Case No. 08-CV-22430, 2009 WL 1490573, at *5 (S.D. Fla. May 27, 2009).  To analyze these claims, several courts have applied the same framework used to analyze retaliation claims brought under Title VII.  <u>Id</u>. at *5 (citing <u>Little v. United Techs., Carrier Transicold Div.</u>, 103 F.3d 956, 959 (11th Cir. 1997)).

Accordingly, to establish a *prima facie* case of retaliation under Section 1981, an

employee must show that he engaged in statutorily protected activity, he suffered a materially adverse action, and there existed a causal relationship between the protected activity and the adverse action. Little, 103 F.3d at 959.

To show that he engaged in statutorily protected activity, an employee must demonstrate that he opposed an unlawful employment practice that he reasonably believed to have occurred. See Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002). This burden consists of both a subjective and an objective component. Id. An employee must not only show that he subjectively believed that his employer was engaged in unlawful employment practices, but also that his belief, though perhaps mistaken, was objectively reasonable in light of the facts and record presented. Id. Statutorily protected activity includes not just formal complaints, but also informal complaints to supervisors and complaints made pursuant to an employer's internal grievance procedures. See Pipkins v. City of Temple Terrace, 267 F.3d 1197, 1201 (11th Cir. 2001); Rollins v. Florida Dep't of Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1989).

To demonstrate a causal relationship, the employee must show that the protected activity and the adverse action were not completely unconnected and were temporally related. Davis v. Coca-Cola Bottling Co., 516 F.3d 955, 978 n.52 (11th Cir. 2008). To establish temporal relation, the employee cannot merely show that the materially adverse action occurred *sometime* after the protected activity. Id. Rather, the employee must show that the events were "very close" in proximity. Id. (citing Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 1511 (2001)). If a long period of time passed between the two events, the inference that the adverse action was improperly motivated weakens. See, e.g., Garrett v. Univ. of Alabama, 507 F.3d 1306, 1316-17 (11th Cir. 2007) (finding that a four and one-half month period between

an employee's request for medical leave and her demotion was not sufficient evidence that her demotion was retaliatory); Balletti v. Sun-Sentinel Co., 909 F.Supp. 1539, 1549 (S.D. Fla. 1995) (finding that a six month period between an employee's complaint of sexual harassment and her termination was insufficient evidence of a causal connection between the two events).

If the employee establishes a *prima facie* case of retaliation under Section 1981, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the challenged adverse action.  Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2007).  If the employer satisfies its burden, the employee must then show that the employer's proffered reason is a pretext for prohibited retaliatory conduct.  Id.

### 2. No Statutorily Protected Activity

Plaintiff cannot establish a *prima facie* case of retaliation because he did not engage in any statutorily protected activity.  Plaintiff argues that the following testimony demonstrates that he told Berg that he believed that Berg was "behaving in a discriminatory manner" towards Barnum:

> I compared Mr. Barnum's performance, objective performance versus that of his peers.  And in every category of measurable performance Mr. Barnum either exceeded his peers or equaled his peers.  So, therefore, my argument was if Mr. Barnum is not doing well then certainly his peers aren't either and why aren't we terminating them?

(Dkt. 40 at 13; Pl.'s Dep. 8).  This testimony does not demonstrate that the Plaintiff complained to Berg that Berg's treatment of Barnum was *discriminatory*, as opposed to merely unfair.  In fact, he does not know if he ever specifically told Berg that Berg's treatment of Barnum was based on Barnum's race.  Although Plaintiff claims he complained to Berg about race

discrimination, he testified that he told Berg that he believed Berg's treatment of Barnum was "unfair and wrong" because Barnum's performance on measurable criteria was equal to or better than the performance of Barnum's peers. Plaintiff does not remember if he ever told Berg that his treatment of Barnum was "unfair and wrong" because it was based on Barnum's race, as opposed to "unfair and wrong" because the Plaintiff did not agree with Berg's criticisms of Barnum's work performance. Furthermore, although Berg discussed Barnum's performance with Plaintiff on numerous occasions, and he was aware that Plaintiff disagreed with his decision to terminate Barnum, Berg denies that Plaintiff ever accused him of discriminating against Barnum on the basis of race. An employee's complaint about unfair treatment that does not include allegations of illegal discrimination does not constitute statutorily protected activity. Coutu, 47 F.3d at 1074 (holding that an employee's internal grievance did not constitute statutorily protected activity because she alleged only unfair treatment and made no allegations of discrimination).

### 3. No Causal Relationship Between Alleged Protected Activity and Termination

Assuming *arguendo* that Plaintiff's complaints to Berg between December 18, 2003 and March 2004 regarding Berg's "unfair and wrong" treatment of Barnum constituted protected activity, the complaints were made between six and nine months prior to Berg's decision to terminate Plaintiff's employment on September 16, 2004. Too much time passed between Plaintiff's complaints and his termination to support an inference that his termination was improperly motivated, especially considering that Berg gave Plaintiff numerous opportunities to improve his job performance during that period. Accordingly, Plaintiff has not established a causal relationship between any protected activity he might have engaged in and his termination.

### 4.   Legitimate, Non-Retaliatory Reasons for Termination

Even if Plaintiff could establish a *prima facie* case of retaliation, Defendant has proffered legitimate, non-retaliatory reasons for terminating Plaintiff's employment. Berg terminated Plaintiff for unsatisfactory work performance that pre-dated Plaintiff's alleged complaints to Berg by several months. Plaintiff failed to perform his duties during the hurricane, and Berg had to assume control of the Plaintiff's responsibilities. Berg determined that he no longer needed Plaintiff's position because Berg was already performing the majority of Plaintiff's duties himself. Observing that Plaintiff had made little or no improvement in his performance despite several months of counseling, support, and advice, Defendant exercised its prerogative as an employer at-will and terminated Plaintiff's employment.

### 5.   No Demonstration of Pretext

Plaintiff contends that "triable issues on pretext" exist that preclude summary judgment in Defendant's favor. Plaintiff claims that he "will testify that his white co-workers, Webb, Earlman, [sic] and Barbara Walsh, had a documented history of a much poorer work performance than Michael Barnum and they were not terminated; these deficiencies included not meeting objective performance standards."

This statement presents several problems. First, whether Barnum's coworkers exhibited poorer performance than Barnum is not relevant to whether Defendant's proffered legitimate, non-discriminatory, non-retaliatory reasons for Plaintiff's termination are pretextual. Second, Plaintiff has not cited to the record and has not filed an affidavit to support this testimony. Third, Plaintiff testified that he never formally documented Webb's or Erlman's alleged performance deficiencies, and no other evidence on record suggests that either employee had a "documented

history" of poor work performance.  Finally, Defendant is not aware of any employee named "Barbara Walsh."  Plaintiff did not disclose her name when asked to identify all of Barnum's peers, and Plaintiff did not include her name on his witness list.

Plaintiff has failed to make out a prima facie case of either discriminatory or retaliatory termination.  Even if he had done so, he has failed to demonstrate pretext.  Summary judgment on both claims is warranted.

## IV.    <u>CONCLUSION</u>

THE COURT, being fully advised and having considered the pertinent portions of the record, hereby

ORDERS AND ADJUDGES that Defendant's Motion for Summary Judgment, filed August 28, 2009 **[DE 27]**, is GRANTED.  Final judgment shall be entered by separate order.

DONE AND ORDERED at Chambers in West Palm Beach, Florida, this 7th day of December, 2009.


S/Kenneth L. Ryskamp
KENNETH L. RYSKAMP
UNITED STATES DISTRICT JUDGE